POLEN, J.
 

 Arthur Pulcini appeals his conviction and sentence for unlawful sexual activity with a minor, C.H. He contends that the trial court erred in (1) admitting the testimony of the
 
 Williams
 
 rule witness; (2) allowing the prosecution to treat witness Brandon Meloche as hostile; (3) refusing to admit appellant’s statement to police in its entirety; and (4) denying appellant’s motion for mistrial following the State’s suggestion during closing argument, in the absence of any evidence, that appellant had been arrested for the prior conduct introduced as
 
 Williams
 
 rule evidence. We reverse and remand for a new trial on the first issue, finding that the trial court allowed the presentation of improper
 
 Williams
 
 rule evidence. This moots the fourth issue, but we do comment briefly on
 
 *341
 
 the other two issues as they may arise again on retrial.
 

 In September of 2005, C.H. was dating appellant’s nephew, Brandon Meloche. She was sixteen years old at the time. She visited appellant’s house often. Tommy and Tracy Burton lived on the property, and were always present when C.H. visited, including on the evening in question. The State’s case centered around the credibility of C.H.’s testimony. C.H. said she went to appellant’s house after work, around 7:00 p.m. The Burtons were there, and a man named Larry,
 
 [1]
 
 who also lived on the property. When C.H. arrived, appellant told her to meet him in his office. They talked about Brandon. C.H. was upset because she could not reach him. Appellant gave C.H. two white, oblong pills, which he said were antidepressants. C.H. took the pills with a rum and coke. At this point, she and appellant were sitting at the cabana bar with the Burtons and Larry. Appellant asked C.H. if she wanted to go for a ride on his ATV around the property. C.H. felt tired and “woozy,” but agreed to go. Appellant stopped the ATV far away from the cabana, so he and C.H. could talk in private. As they were talking, appellant grabbed the back of C.H.’s head, unzipped his pants, pushed C.H.’s head forward, and forced her to perform oral sex on him. He kept one hand on her head and put the other under her shirt; he felt her breast, over her bra. He also unzipped her pants and felt her vagina underneath her underwear. Appellant then drove them back to the bar area, where they got off the ATV. He grabbed C.H.’s wrist, gave her $100 and said, “we’re going to have problems,” if she told anyone. When they got back to the bar, the Burtons were still there. C.H. did not say anything to them, but tried to “star[e] them down” to get their attention. At one point, C.H. kicked Tommy Burton’s chair. Appellant called C.H. over and reminded her that if she said anything they would have problems. C.H. drove herself home and went straight to bed. When she woke up the next day she had several new voice messages from Brandon. She called him and told him what had happened with appellant. The following day, C.H. went to the police department, where she gave a statement to Detective Chastain.
 

 C.H. was examined at a sexual assault treatment center, two days after the incident. She provide several items of clothing, blood and urine samples for a toxicology screen, as well as vaginal, oral and breast swabs, and a hair sample, for DNA testing. C.H. told the examining nurse that appellant digitally penetrated her, forced her to perform oral sex on him, may have kissed her breast area, and that his semen may have gotten in her hair. C.H. said she had not bathed since the assault, but had brushed her teeth, eaten, ingested liquids, and had been vomiting since the incident. She had no physical injuries or trauma to her genital area. C.H. gave the nurse a $100 bill, which she said appellant had given her when he told her not to say anything. C.H. asked for the money back before she left.
 

 No semen or foreign DNA was detected on any of the samples. Toxicology results revealed the presence of nicotine in C.H.’s urine, but no other drugs. C.H.’s blood sample revealed the presence of an anti-convulsant used to treat seizures and headaches. No alcohol was detected.
 

 On cross-examination, C.H. acknowledged she had lied in her deposition when she said she did not leave the house for a year and a half after the incident because she was afraid of appellant. She then clarified that she left her house only to go
 
 *342
 
 to work. C.H. did not seek mental health treatment until a week before trial (two and a half years after the incident).
 

 Appellant’s phone records reflected that C.H. called him multiple times in the weeks before the incident, though C.H. denied making all of the calls. She said Brandon often used her cell phone.
 

 When Brandon was called as a witness, he said he did not want to be at the trial; he was there only because he was subpoenaed. After identifying appellant in the courtroom as his uncle, he requested a break. The court took a brief recess. Back on the record, Brandon testified that he had previously been intimate with C.H., who was a friend. He remembered giving a statement over the phone, to Detective Chastain, two days after the incident, but did not recall exactly what he said to the detective. Brandon also remembered going to his uncle’s home the day after the incident and having a verbal confrontation with him, but could not recall what his uncle had said to him that day to make him angry. When Brandon’s statement did not refresh his recollection, the State requested permission to treat the witness as hostile. The trial court granted the request, noting: “He already said he doesn’t want to be here, the first question. When he — within the first couple of questions he began to cry, and we had to take a break. So the State’s request is granted.” The court clarified that the prosecutor could not read the statement, but could ask leading questions. In the colloquy that followed, Brandon was confronted with statements he made to Detective Chastain — such as, that his uncle had told him that C.H. “gave him oral.” However, Brandon did not remember making any of these statements.
 

 On cross-examination, Brandon said the only way he knew about any pills was from C.H. His statement also reflected that appellant never mentioned pills to him. Brandon said he could not remember the details of the verbal confrontation with his uncle because he was high on marijuana, which he smoked daily at that time. He did not recall being high when he spoke to Detective Chastain.
 

 Detective Chastain
 
 Mirandized
 
 appellant and took his statement. Appellant said C.H. was at his house on the day in question, and that they took a short ride on his ATV around the property. After-wards, they went back to the bar and sat around for an hour. Appellant went swimming, and C.H. came over to say goodbye on her way out. Appellant denied giving C.H. any pills, but said he did give C.H. money that night. When asked whether or not he had touched the victim’s vagina, appellant said, “no, now you’re getting too crazy for me.”
 

 Williams
 
 rule witness, C.S., testified that she used to keep her horse on appellant’s property nineteen or twenty years ago. She took care of his horses and babysat his children, in exchange for board. C.S. was about twelve years old at the time. Two incidents with appellant at his home made her uncomfortable. The first occurred when C.S. and a girlfriend were in a bathroom getting ready. C.S. was showering. Appellant entered the bathroom, undressed, put C.S.’s friend in the shower with C.S. and then got in himself. He said he had to rinse off. Appellant did not touch C.S.
 

 The second incident occurred in appellant’s office one afternoon. C.S. was there, along with two other kids. “[E]v-eryone was wrestling around,” when appellant got on top of C.S., straddled her, held her hands above her head, pulled her blouse over her face and put his mouth on her breast. The incident happened quickly. Appellant did not give C.S. any money or provide her with any alcohol or drugs.
 
 *343
 
 After these incidents, C.S. told her mother she did not want to go over to appellant’s house anymore because she “was uncomfortable with the situation that [she] was becoming a part of.”
 

 Prior to C.S.’s testimony, the trial court gave a
 
 Williams
 
 rule instruction, advising the jury that the testimony should be considered only as it relates to proof of motive, intent, plan, the absence of mistake or accident on the part of the defendant or to corroborate the testimony of C.H.
 

 The defense called the Burtons as witnesses. Tom Burton testified that he had lived on appellant’s property for three and a half years, with his wife and two children. C.H. visited the house often with appellant’s nephew, to hang out. On the night in question, they were all sitting around the tiki bar, listening to music and talking. No one, including C.H., drank alcohol that night. Appellant rode up on his ATV and wanted to know what was going on. For the next twenty minutes or so, they all sat there, talking and laughing. Then appellant said he had some things to do and went back over to his ATV. C.H. jumped up and asked to go for a ride. She hopped on the back of the vehicle and they drove off, returning less than five minutes later.
 

 Mr. Burton lost sight of appellant and C.H. when they were gone, but could hear the engine of the ATV. When they returned, appellant went into the house and C.H. came back over to the tiki bar where the Burtons were sitting. A song came on that C.H. liked, and she started dancing by the bai*, “like a stripper.” She was not stumbling or slurring her words. Appellant came back out later and got in the pool. Then C.H. got a call on her cell phone and said she had to go. She said she needed gas money. Appellant said his wallet was over by the dock. C.H. took some money out of the wallet and then left. Later, when appellant got back out of the pool, he said $100 was missing from his wallet.
 

 Tracy Burton testified that C.H. did not appear to be intoxicated when she arrived at appellant’s house that evening. She sat around the tiki bar with the Burtons for fifteen minutes or so, when appellant rode up on his ATV. Appellant asked what they were up to, and said he had to take some garbage out. It was appellant’s nightly routine to empty his truck of palm fronds and garbage left over from landscaping, and take them to the dumpster. As he walked back to his ATV, C.H. said she wanted a ride and ran over to the vehicle. She sat on the back, and she and appellant rode off. They took the garbage to the dumpster, which was maybe a half an acre away from the tiki hut, and returned four or five minutes later. Like her husband, Mrs. Burton could hear the engine of the ATV running the whole time they were gone. When they returned, C.H. walked over to the tiki bar where the Burton’s were sitting. She looked the same as she did before she went on the ATV. She had no difficulty standing up and was not slurring her words. Appellant went inside the house for a half an hour or so. C.H. stayed outside with the Burtons, listening to music. She offered to teach Mrs. Burton how to dance. They talked about C.H.’s new job and how she was trying to get a hold of Brandon. Then C.H. got a phone call, and asked appellant for some gas money. Appellant was in the pool at this point. He told C.H. his money was over by the porch. C.H. walked around the pool, came back through the tiki hut to say goodbye, and then left.
 

 Appellant argues that the trial court erred in admitting the
 
 Williams
 
 rule testimony of C.S., as it was dissimilar to the crime charged and too remote in time. The State responds that the trial court
 
 *344
 
 correctly admitted the evidence because it was relevant to corroborate the victim’s testimony, and it was not unfairly prejudicial. We agree with appellant and reverse for a new trial.
 

 This court reviews the trial court’s admission of
 
 Williams
 
 rule evidence for abuse of discretion.
 
 Grier v. State,
 
 27 So.3d 97, 99 (Fla. 4th DCA 2009).
 

 Evidence of bad acts not included in the charged offenses is generally referred to as “collateral crimes evidence.” Collateral crimes evidence includes similar fact evidence, which is governed by section 90.404, Florida Statutes, and is commonly referred to as
 
 “Williams
 
 rule evidence.”
 
 See Williams v. State,
 
 110 So.2d 654 (Fla. 1959). As defined by section 90.404(2), Florida Statutes (2005):
 

 (a) Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
 

 (b)l. In a criminal case in which the defendant is charged with a crime involving child molestation, evidence of the defendant’s commission of other crimes, wrongs, or acts of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.
 
 [2]
 

 In
 
 McLean v. State,
 
 934 So.2d 1248 (Fla. 2006), the Florida Supreme Court stated: “To guide the trial courts in deciding whether to admit evidence of prior acts of child molestation when it is offered to corroborate the victim’s testimony, we discuss the steps that the trial courts should take.”
 
 Id.
 
 at 1262. The court continued:
 

 In assessing whether the probative value of evidence of previous molestations is substantially outweighed by the danger of unfair prejudice, the trial court should evaluate: (1) the similarity of the prior acts to the act charged regarding the location of where the acts occurred, the age and gender of the victims, and the manner in which the acts were committed; (2) the closeness in time of the prior acts to the act charged; (3) the frequency of the prior acts; and (4) the presence or lack of intervening circumstances. This list is not exclusive. The trial courts should also consider other factors unique to the case.
 

 Id.
 

 Strohm v. State,
 
 985 So.2d 640 (Fla. 4th DCA 2008), is instructive. In
 
 Strohm,
 
 the defendant was tried and convicted on one count of capital sexual battery against his daughter. The offense allegedly occurred between 1990 and 1991.
 
 Id.
 
 at 641. The State sought to introduce a 2005 conviction for lewd or lascivious molestation and a 1974 rape conviction.
 
 Id.
 
 After the
 
 Williams
 
 rule hearing, the trial court decided to allow into evidence the testimony of the victim of the 1973 rape, but deny the testimony of the other
 
 Williams
 
 rule witness.
 
 Id.
 
 This court reversed on the basis that the 1973 rape was dissimilar and remote in time to the crime for which the defendant was currently on trial.
 
 Id.
 
 at 642. The court explained:
 

 The 1973 rape for which appellant was convicted in 1974 was on a
 
 twelve-year-old
 
 who testified that she did not know appellant. The capital sexual battery in
 
 *345
 
 this case was on appellant’s daughter and occurred between August 1990 and May 1991 when the victim was
 
 eight
 
 years old.
 

 In addition, there were
 
 substantial other dissimilarities
 
 in the crimes. In the 1973 rape the victim was vaginally penetrated while the crime in the instant case consisted of another form of sexual abuse.
 

 The 1973 rape was
 
 remote in time
 
 to the capital sexual battery charge in this case,
 
 seventeen years
 
 prior. The 1973 rape was a one-time occurrence on a stranger to the appellant. In this case the sexual battery was on appellant’s daughter over a several month period. In this case there was no evidence of “the presence or lack of intervening circumstances.”
 

 Strohm,
 
 985 So.2d at 641^42 (citing
 
 McLean,
 
 934 So.2d at 1262) (emphasis added).
 

 In this case, the trial court found four similarities between the prior and charged conduct: (1) “both alleged victims were young girls”; (2) “Defendant allowed his property to be a place of recreation to the young girls, thereby setting up access to the victims”; (3) “Defendant kissed the breasts of the alleged victims”; and (4) “both incidents arose while the alleged victims were at the defendant’s home with other people at the residence.” The court farther found that the probative value was not outweighed by the prejudicial effect. We disagree, finding these alleged similarities either weak or not supported by the record.
 

 First, as noted by appellant, every prior incident of unlawful sexual activity with a minor involves a “young” alleged victim, and thus, will always be “similar” in that respect. Here, the
 
 Williams
 
 rule witness, C.S., was twelve years old at the time of the alleged conduct; the instant victim, C.H., was sixteen years old.
 
 See Strohm,
 
 985 So.2d at 641 (indicating that the four-year difference between the victims, ages eight and twelve, was a dissimilarity).
 

 The second alleged similarity, that appellant “allowed his property to be a place of recreation” so that he could “set up access” to victims, is weak. C.S. took care of horses on appellant’s property and babysat his children, while C.H. was a frequent guest at appellant’s home because she was dating appellant’s nephew.
 

 The record belies the third alleged similarity, because there was no testimony that appellant kissed C.H.’s breast. Rather, C.H. testified that appellant put his hand under her shirt, and felt her breast, over her bra. Even so, the prosecution focused not on that act, but on the alleged forced oral sex, which differs entirely from the conduct alleged to have occurred with C.S.
 
 See Strohm,
 
 985 So.2d at 641-42 (noting the victim in the prior case was vaginally penetrated while the crime charged consisted of another form of sexual abuse).
 

 The fourth alleged similarity — that “both incidents arose while the alleged victims were at the defendant’s home with other people at the residence” — is also weak. Though both incidents took place on appellant’s property, the incidents with C.S. occurred in the presence of others, while the incident with C.H. occurred in a secluded area.
 

 Other dissimilarities in the crimes are: (1) the prior acts did not involve any drugs or alcohol, while in the instant case, C.H. testified that appellant gave her pills, which she took with a rum and coke; (2) the prior acts did not involve appellant giving the alleged victim money to keep quiet; and (3) perhaps most significantly, the incidents involving C.S. were extremely remote in time to the offenses charged
 
 *346
 
 in this case, occurring seventeen years pri- or.
 
 [3]
 

 While “[a] collateral crime proven by similar evidence does not need to be absolutely identical to the crime charged in order to be admissible,”
 
 see Triplett v. State,
 
 947 So.2d 702, 703 (Fla. 5th DCA 2007), the alleged crimes must be similar in at least some, if not many, respects.
 
 See id.
 
 at 704 (upholding trial court’s admission of
 
 Williams
 
 rule testimony where collateral act of molestation and the charged molestation shared “numerous similarities”);
 
 see also Grier’,
 
 27 So.3d at 101 (upholding admissibility of collateral crime evidence where “many points of similarity between the charged act and collateral act exist”);
 
 Macias v. State,
 
 959 So.2d 782, 785 (Fla. 4th DCA 2007) (finding only one “fundamental difference” between the charged offense and collateral act). Here, the collateral acts do not share sufficient points of similarity with the charged crime to be admissible.
 

 Based on the above, we find that the trial court abused its discretion in admitting the collateral crime evidence involving C.S.
 

 Accordingly, we must consider whether the error was harmless. “The pertinent question in a harmless error analysis is not the sufficiency or quality of the remaining, properly admitted evidence; rather, it is “whether there is a reasonable possibility that the error affected the verdict.’”
 
 Chavez v. State,
 
 25 So.3d 49, 54 (Fla. 1st DCA 2009) (citing
 
 State v. DiGuilio,
 
 491 So.2d 1129, 1139 (Fla.1986)). Erroneous admission of collateral crimes evidence is presumptively harmful.
 
 Robertson v. State,
 
 829 So.2d 901, 913-14 (Fla.2002);
 
 Pratt v. State,
 
 1 So.3d 1169, 1171 (Fla. 4th DCA 2009). This is particularly the case where, as here, the prior acts and charged offense are sexually based.
 
 See McLean,
 
 934 So.2d at 1256 (“Because of the commonly held belief that individuals who commit sexual assaults are more likely to recidi-vate as well as societal outrage directed at child molesters, the admission of prior acts of child molestation has an even greater potential for unfair prejudice than the admission of other collateral crimes.”).
 

 Here, the State’s case boiled down to the credibility of the victim, whose testimony was contradicted by two defense witnesses, and uncorroborated by any physical evidence. This, coupled with the fact that the State highlighted the
 
 Williams
 
 rule evidence in closing argument, leads us to conclude that the error could not have been harmless. Consequently, we reverse and remand for a new trial. This moots appellant’s fourth argument — that the trial court should have granted a mistrial following the prosecutor’s improper suggestion during closing that appellant had been arrested for the prior conduct introduced as
 
 Williams
 
 rule evidence. Because the remaining two issues may arise again on remand, we comment on them briefly.
 

 Appellant argues that the trial court erred in granting the State’s request to declare Brandon Meloche a hostile wit
 
 *347
 
 ness, where Brandon merely failed to recall events. Appellant contends that, as a result of the erroneous ruling, the jury heard portions of Brandon’s otherwise inadmissible prior statement through leading questions. We disagree.
 

 The standard of review on the admission of evidence is abuse of discretion as limited by the rules of evidence.
 
 Hudson v. State,
 
 992 So.2d 96,107 (Fla.2008).
 

 Section 90.612(1), Florida Statutes, provides that the judge shall exercise reasonable control over the mode of the interrogation of witnesses. Subsection (8) provides, in relevant part, that “[ljeading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness’s testimony.... When a party calls a hostile witness, ... interrogation may be by leading questions.”
 

 In addition, section 90.608(1), Florida Statutes, states that “[a]ny party, including the party calling the witness, may attack the credibility of a witness by ... [introducing statements of the witness which are inconsistent with the witness’s present testimony.” The statement, however, “should be
 
 truly inconsistent,
 
 and caution should be exercised in permitting impeachment of a witness who has given favorable testimony but simply fails to recall every detail
 
 unless the loitness appears to be fabricating.” Morton v. State,
 
 689 So.2d 259, 264 (Fla.1997),
 
 receded from on other grounds by Rodriguez v. State,
 
 753 So.2d 29 (Fla.2000) (emphasis added). In addressing these issues, the trial court is afforded broad discretion in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or confusion.
 
 Ocasio v. State,
 
 994 So.2d 1258, 1262 (Fla. 4th DCA 2008).
 

 The trial court did not abuse its discretion in permitting the State to lead and impeach Brandon. As the trial court noted, once on the stand, Brandon admitted he did not want to be there, became upset upon identifying appellant as his uncle and began to cry. A recess was taken so he could speak to his mother, who is appellant’s sister. Brandon then testified that he did not remember many of the statements he made to Detective Chastain. Yet, Brandon remembered that appellant did
 
 not
 
 tell him that he gave C.H. drugs. He was also able to remember that he smoked marijuana daily at that time, but that he was not high the day he spoke to Detective Chastain. In addition, when asked whether he remembered appellant telling him that he and C.H. smoked, drank and went for a ride on the ATV on appellant’s property that day, Brandon responded: “[C.H.] told me that.” In his statement, however, he said that appellant had told him those things. These latter statements are truly inconsistent, and material to the case. Overall, Brandon’s testimony falls into the category of a witness who appears to be fabricating, rather than a witness who simply cannot remember every detail.
 

 In light of the foregoing, the trial court did not abuse its discretion in allowing the State to lead and impeach the witness with prior inconsistent statements.
 

 Finally, appellant argues that the trial court erred in refusing to admit appellant’s statement to Detective Chas-tain in its entirety, thereby violating the “rule of completeness.” The rule is codified in section 90.108(1), Florida Statutes, which provides in pertinent part:
 

 When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him or her at that time to introduce any other part or any other writing or recorded statement that in fairness ought to be
 
 *348
 
 considered contemporaneously. An adverse party is not bound by evidence introduced under this section.
 

 The purpose of the rule of completeness is to avoid the potential for creating misleading impressions by taking statements out of context.
 
 Larzelere v. State,
 
 676 So.2d 394, 401 (Fla.1996). Under this rule, once a party “opens the door” by introducing part of a statement, the opposing party is entitled to contemporaneously bring out the remainder of the statement in the interest of fairness.
 
 Id.
 
 at 401-02. The rule of completeness, however, is not absolute and a trial court may exercise its discretion to exclude irrelevant portions of a recorded statement.
 
 Layman v. State,
 
 728 So.2d 814, 816 (Fla. 5th DCA 1999).
 

 “Self-serving statements are not admissible under section 90.803(18),”
 
 see Lott v. State,
 
 695 So.2d 1239, 1243 (Fla.1997), and section 794.05(3) states that “[t]he victim’s prior sexual conduct is not a relevant issue in a prosecution under this section.”
 

 In this case, there was no violation of the rule of completeness because the trial court merely excluded irrelevant portions of appellant’s statement, which contained self-serving, non-exculpatory hearsay and statements concerning the victim’s prior sexual conduct. Further, in its direct examination of Detective Chastain, the State did not create misleading impressions or take statements out of context. Finally, as the State argues, the admission of the entire statement would have likely been detrimental to the defense. Therein, appellant admitted to sitting at the bar with the victim and the Burtons on the night in question and to giving the victim gas money, but did not remember how much. This would have conflicted with defense witness Tom Burton’s testimony that appellant looked in his wallet and stated that C.H. took a $100 bill. Appellant also told the detective he had given money to and purchased clothes for C.H. in the past.
 

 In summary, we reverse and remand for a new trial on point one, and affirm as to points two and three. Appellant’s fourth issue is now moot.
 

 Reversed and remanded for a new trial.
 

 LEVINE, J., and GREENHAWT, SUSAN F., Associate Judge, concur.
 

 [1]
 

 . "Larry” was not called as a witness by either party.
 

 [2]
 

 2. For the purposes of paragraph (b), the term “child molestation” includes lewd or lascivious offenses committed upon or in the presence of persons less than 16 years of age. § 90.404(2)(b)2.
 

 [3]
 

 . We note that the remoteness factor would be less significant when the sexual abuse is generational or intrafamilial, and if the prior incidents were similar to the current act.
 
 See State v. Maestas,
 
 224 N.W.2d 248, 251 (Iowa 1974) (concluding intrafamilial nature of pri- or abuse coupled with similarity of the prior acts rendered six- and ten-year-old incidents admissible);
 
 Bryson v. State,
 
 210 Ga.App. 642, 437 S.E.2d 352, 355 (1993) (holding thirty-one-year lapse between abuse of daughter and granddaughter did not render prior abuse evidence inadmissible per se);
 
 State v. Cichon,
 
 458 N.W.2d 730, 734 (Minn.Ct.App.1990) (finding fourteen-year gap did not render pri- or abuse evidence irrelevant in intrafamilial situation when events were similar).